IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| NANCY A. PARTIN, | Case No. 3:18 CV 1573 |
| Plaintiff, | Judge Jeffrey J. Helmick |
| v. | Magistrate Judge James R. Knepp II |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | REPORT AND RECOMMENDATION |

## INTRODUCTION

Plaintiff Nancy A. Partin ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated July 11, 2018). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May 2015, alleging a disability onset date of April 30, 2012. (Tr. 213-22).[1] Her claims were denied initially and upon reconsideration. (Tr. 76-131). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 149-50). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the

---

1. Plaintiff later amended her alleged onset date to February 26, 2015. *See* Tr. 244.

ALJ on August 16, 2017. (Tr. 35-75). On January 30, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-28). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on July 10, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1968, Plaintiff was 46 years old on her amended alleged onset date. *See* Tr. 213, 244. At the time of the hearing, Plaintiff lived with her boyfriend and his mother. (Tr. 42). Plaintiff had a driver's license and drove twice per week. (Tr. 43). Driving was difficult, but she managed with cruise control, and used her left foot to brake. *Id.*

Plaintiff believed she could not work due to carpal tunnel syndrome in her wrists, pain in her back and neck, and an inability to sit for lengthy periods. (Tr. 49-50). She estimated she could sit for 30 to 45 minutes, stand for 15 to 20 minutes, and walk for 10 minutes or 75 feet. (Tr. 50).

Plaintiff presented at the hearing with a crutch, which she testified she used off and on since an accident. (Tr. 50-51). Plaintiff also had a boot on her right ankle and calf. (Tr. 62). She testified she used a walker for six to seven months after the accident, and other assistive devices such as a cane since the accident. (Tr. 51).

Plaintiff rated her right foot pain as eight or nine out of ten. (Tr. 53). Every manner of activities aggravated her pain, which was constant. (Tr. 53-54). Plaintiff elevated her leg about three hours per day. (Tr. 54). She needed a handrail and a cane or crutch to go up or down stairs. (Tr. 61); *see also* Tr. 56 ("I can go up and down stairs. It's just I have to have my crutch with me and go down one step at a time."). Plaintiff also testified she could not walk at a normal pace on

2

flat ground. (Tr. 62) ("I walk slowly . . . I have to stop and take - - you know, just kind of stop and regather myself, and then I can go again, but I cannot walk at a normal pace."). Plaintiff's left ankle hurt also, but providers were addressing her right ankle first. (Tr. 63). Plaintiff took prescription Norco after ankle surgery. *See* Tr. 51-53.

Plaintiff testified she had lower right back pain, and neck pain for which she took ibuprofen. (Tr. 51-52). Injections had not helped with her back pain. (Tr. 52). Plaintiff's physician was planning surgery to address her low back pain, but her accident and ankle problems postponed that plan. *Id.*

Plaintiff grocery shopped every two weeks, with her boyfriend, using an electric cart. (Tr. 55). At home, Plaintiff was able to sweep ("but . . . it takes me a little bit of time") and do dishes, but required breaks; she could not mop, vacuum, or do yard work. (Tr. 56). Her boyfriend did the laundry, but she folded it. *Id.* Plaintiff was able to perform personal care independently. (Tr. 56-57).

Relevant Medical Evidence[2]

Prior to her amended alleged onset date, Plaintiff had treatment, including physical therapy, for back pain and sciatica. *See* Tr. 362, 364-70, 371-72.

On February 26, 2015 – Plaintiff's amended alleged onset date – Plaintiff was involved in a motor vehicle accident. *See* Tr. 499. Plaintiff was hospitalized through March 9, 2015 and during her hospital stay, underwent, *inter alia*, surgical repair of an open fracture of the left ankle,

---

2. The undersigned summarizes only the evidence relevant to Plaintiff's arguments. Specifically, Plaintiff challenges the ALJ's evaluation of her physical impairments at Step Three. *See* Doc. 11, at 10-14). She also challenges the ALJ's determination at Step Five, but this argument depends on an interpretation of the VE testimony, not of the evidence underlying Plaintiff's mental impairments. As such, those records are not summarized herein. *See generally Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

excisional debridement of an open fracture of the right ankle, treatment of the right distal tibia surface with fixation of tibia and fibula, and treatment of a right distal radius intra-articular fragments. *See id.* X-rays during her stay document these injuries. *See* Tr. 839, 926, 928. Plaintiff's post-operative diagnosis was left trimalleolar ankle fracture, near amputation right ankle, and right distal radius fracture. (Tr. 532). On discharge to a skilled nursing facility, she was instructed to be non-weightbearing on both legs. (Tr. 578-79).

The following month, Plaintiff followed up with Jason Bowersock, M.D. (Tr. 583-86). Dr. Bowersock noted diagnoses of, *inter alia*, right comminuted distal shaft fibula fracture, right distal tibia fracture, left tibia fracture, and left ankle trimalleolar fracture/dislocation. (Tr. 585). On examination, Plaintiff denied neck or back pain, numbness, or tingling; she also reported gradually decreasing pain. (Tr. 583).

In April 2015, Plaintiff saw a nurse practitioner at the Orthopaedic Institute of Ohio for a "lumbar recheck". (Tr. 1131-33). Plaintiff reported an increase in her low back pain since her accident, and that she had been immobile due to her ankle fractures. (Tr. 1131). The provider assessed spinal stenosis of the lumbar region with neurogenic claudication, degeneration of lumbar intervertebral disc, and spondylolisthesis. (Tr. 1132). X-rays taken later that month showed good position of the right ankle and satisfactory position of the left ankle. *See* Tr. 885. Plaintiff subsequently underwent surgery to remove temporary pins placed in the right ankle. (Tr. 890).

In May 2015, Steven Haman, M.D., at the Orthopaedic Institute of Ohio noted x-rays showed "satisfactory alignment of the ankle fractures". (Tr. 1126). Plaintiff was still non-weightbearing, and complained of pain and right ankle stiffness, but no numbness or tingling. *Id.* On examination, Plaintiff was "a little bit stiff with flexion and extension" on the right, but had

4

good flexion and extension on the left. *Id.* Plaintiff was instructed to begin weightbearing on both ankles, with a walking boot on the right. (Tr. 1126-27).

At a June 2015 follow-up appointment, Plaintiff was "doing reasonably well", "ambulating fairly well with a walker in the office", and with a boot on her right ankle. (Tr. 1172). She complained of sharp pain in both ankles, worse with ambulation. *Id.* X-rays showed satisfactory position of the trimalleolar right ankle fracture, but a "[m]edial mal vertical shear type fracture is not completely healed yet", and a healed fracture in the left ankle. *Id.*

In August, Plaintiff ambulated with a wheeled walker, and reported stabbing and sharp pain worse with walking, bending, standing, and chores. (Tr. 1165). She had a decreased and painful range of motion in her spine. *Id.* Grace Desari, M.D., assessed chronic pain syndrome. (Tr. 1166). Later that month, Plaintiff reported continued right ankle pain. (Tr. 1162). She was noted to be "weightbearing in a boot." *Id.* On examination, Plaintiff had pain to palpation in her right ankle, but her range of motion was "nearly full" and she had good sensation. *Id.* The provider noted x-rays showed "[p]ossible nonunion of the fibula". *Id.* Plaintiff underwent an additional surgery because "the medial malleolar" on the right side "does not appear to be completely healed' and she had a "gross nonunion." (Tr. 1295).

In September, Plaintiff saw a physician's assistant at the Orthopaedic Institute of Ohio. (Tr. 1160-61). She was doing "pretty well" except for a fall a few days prior in which she injured her left ankle trying to keep her weight off her right. (Tr. 1160). She reported pain in her left ankle, and the provider noted tenderness on examination and thought "she may have just bruised this area". *Id*. He advised Plaintiff to remain non-weightbearing on the right side, and return in one month. (Tr. 1161).

October 2015 x-rays showed routine healing of the right ankle. *See* Tr. 1158. Plaintiff was non-weightbearing, and denied numbness or tingling. *Id.* In November 2015, x-rays showed "some healing and satisfactory alignment of the ankle as compared to previous x-rays." (Tr. 1387). Plaintiff complained of some right ankle burning pain and soreness at the end of the evening. *Id.* On examination, Plaintiff had some slight tenderness to palpation, good range of motion, and intact sensation. *Id.* Plaintiff was instructed to begin weightbearing as tolerated and follow up in two months. *Id.*

In December 2015, Plaintiff went to the emergency room after rolling her right ankle while putting up Christmas lights outside. (Tr. 1278-84). An x-ray revealed no acute fracture or dislocation, but a nonhealing fracture. (Tr. 1285-86). Plaintiff was discharged with crutches and a walking boot. (Tr. 1283).

In January 2016, Plaintiff reported "weight bearing as tolerated", and had no complaints of pain. (Tr. 1385). On examination, she had no pain to palpation, full range of motion, and intact sensation in her right ankle. *Id.* X-rays showed satisfactory hardware alignment, but it was "difficult to say whether or not things are completely healed." *Id.* Plaintiff was instructed to "increase to no restrictions with activities." (Tr. 1386).

At a February 2016 appointment for lumbar pain, Plaintiff reported lower back, bilateral buttock pain with some numbness and tingling. (Tr. 1383). Plaintiff was also noted to be "completely healed" from her ankle injuries and "has been able to bear weight with the exception of pain coming from the lower back and radiating into the legs." *Id.* On examination, Plaintiff was not using an assistive device, and had a non-antalgic/non-ataxic gait. *Id.*

That same month, Plaintiff saw podiatrist Samuel Neuschwanger, D.P.M., with complaints of bilateral ankle and left lower leg pain. (Tr. 1391-92). On examination, Plaintiff had limited

painful crepitation range of motion in her right ankle joint, and her left ankle joint was painful to palpation, but had normal crepitation-free range of motion. (Tr. 1392). X-rays showed no fractures, metallic hardware, bilateral healed fractures, a "nearly completely obliterated" right ankle joint, and left ankle joint with osteoarthritis. *Id.* Dr. Neuschwanger assessed post-traumatic painful osteoarthritis of both ankles, and performed a left ankle injection. *Id.* The following week, Plaintiff was "ambulating full weightbearing" with reduced pain since the injection. (Tr. 1393). On examination, Dr. Neuschwanger noted similar physical findings, but that the "left ankle joint is now not painful to palpation." (Tr. 1394). Dr. Neuschwanger continued the diagnosis of post-traumatic osteoarthritis, and noted that if Plaintiff's symptoms returned, he would recommend a left ankle arthroscopy. *Id.*

In April, Dr. Neuschwanger noted a left ankle MRI revealed artifacts and it was difficult to see the ankle joint because of the hardware. (Tr. 1397). Plaintiff reported continued pain despite the injection. *Id.* On examination, Plaintiff had swelling in the anterior medial left ankle with pain on palpation. (Tr. 1398). Dr. Neuschwanger recommended a left ankle arthroscopy removal of the hardware bone marrow spray graft with possible osteochondral graft. *Id.* He performed the procedure in May 2016. (Tr. 1411-13).

A May 2016 MRI of Plaintiff's lumbar spine revealed minimal concentric spondylotic disc displacement at L4-L5, and shallow concentric disc displacement at L5-S1. (Tr. 1389-90). It was noted that the "[c]ombination of these findings likely contributes to the patient's low back pain and radiculopathy symptoms." (Tr. 1390).

Also in June 2016, Plaintiff returned to Dr. Neuschwanger complaining of pain in the plantar aspect of her left foot since being out of the fracture walker; she did not have ankle pain. (Tr. 1499). Dr. Neuschwanger assessed plantar fasciitis and referred Plaintiff for physical therapy.

7

(Tr. 1500-01). Plaintiff had an initial physical therapy evaluation later that month (Tr. 1436-41). The physical therapist found limited range of motion and reduced strength in both ankles. (Tr. 1437, 1439). Plaintiff did not attend any other sessions *see* Tr. 1442-45 (missed visit reports), and was discharged for noncompliance (Tr. 1446-47).

In March 2017, Plaintiff saw podiatrist Shawn Ward, D.P.M. (Tr. 1505-08). Plaintiff complained of thickened yellow toenails, and "a lot of ankle pain" that caused her trouble "Even moving". (Tr. 1505). She reported that her pain was 10/10 after being on her feet for 20 minutes. *Id.* On examination, Dr. Ward noted Plaintiff had bilateral ankle swelling, and painful range of motion; her left ankle was worse than the right. (Tr. 1506). X-rays showed severe ankle impingement on the right, degenerative joint disease in both ankles, and subchondral and tibial bone cysts. (Tr. 1508-09). Dr. Ward recommended a left ankle brace, a CT scan, hardware removal, and a possible ankle fusion or replacement. (Tr. 1509).

A right ankle CT scan showed nonunion of an oblique fracture of the base of the medial malleolus, and a healing of transverse fracture of the lateral malleolus. (Tr. 1515).

Plaintiff underwent a right bone marrow aspiration, hardware removal, open reduction and internal fixation, and arthrodiastasis in June 2017, and left ankle surgery in July 2017. *See* Tr. 1519. Later that month, Plaintiff was in a walking boot and reported she "has been weightbearing at home, specifically to go to the bathroom, without crutches" and that this did not cause significant pain. (Tr. 1522). Plaintiff was pleased with the surgery, but had some lateral ankle pain. *Id.* She continued to have numbness and tingling in her digits. *Id.* Dr. Ward assessed post-traumatic right ankle arthritis, status post application of external fixation device for ankle arthrodiastasis, status post removal of external fixation device, and peroneal tendinitis. *Id.* Dr. Ward noted:

> Discussed with patient that given her length of time nonweightbearing, especially considering that she was nonweightbearing prior to the application of the external

fixation device, that she will have to begin weightbearing progressively in a Cam boot. Discussed that patient should slowly get back to weightbearing in the Cam boot using the aid of her crutches or walker. Discussed that she should initially begin weightbearing in a Cam walker with crutches with minimal weight applied to her right foot and then patient should monitor how well she does and then progress to more weight on the operative extremity. Encouraged patient to continue with active range of motion exercise when she is not weightbearing.

(Tr. 1522-23).

*Opinion Evidence*

In July 2015, State agency physician William Bolz, M.D., opined Plaintiff could perform the lifting, carrying sitting, standing, and walking requirements of light work with some postural limitations. (Tr. 83-84). By way of explanation, Dr. Bolz noted: "Ankle fractures are healing without complication. Not expected to last 12 months." (Tr. 84). In December 2015, State agency physician James Cacchillo, D.O., offered a similar opinion. (Tr. 111-12).

In August 2017, Dr. Ward completed a medical source statement regarding Plaintiff's ankle impairments. (Tr. 1519-20). He opined that Plaintiff's right ankle lacked a solid union, and that she should be "completely off work until completely healed". (Tr. 1519). He checked a box indicating Plaintiff was unable to walk a block at a reasonable pace on rough or uneven surfaces, able to walk enough to shop or bank, unable to climb a few steps at a reasonable pace with the use of a single handrail. (Tr. 1520). He indicated Plaintiff's pain was "moderate". *Id.*

VE Testimony

A VE appeared and testified at the ALJ hearing. (Tr. 66-75). The ALJ asked the VE a hypothetical question regarding an individual of Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ. (Tr. 68-70). The question included a limitation to "only occasional interaction with coworkers, supervisors, and the public". (Tr. 68). The VE responded that such an individual could perform jobs such as final assembler, addresser, and sorter. (Tr. 69-

9

70). Plaintiff's counsel then asked additional questions (*see* Tr. 72-74), which are discussed further *infra* in relation to Plaintiff's Step Five Argument.

ALJ Decision

In her written decision, the ALJ found Plaintiff met the insured status requirements for DIB through March 31, 2019 and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 17). She found Plaintiff had severe impairments of: status post multiple fractures to the bilateral lower extremities due to motor vehicle accident with nonunion of the medial malleolar fracture; traumatic arthropathy of the right ankle and foot; posttraumatic arthritis and chronic synovitis of the left ankle; degenerative disc disease of the lumbar spine; scoliosis; and mental impairments variously diagnosed as depression, anxiety, personality disorder, alcohol use disorder, cyclothymia, and disruptive mood dysregulation disorder. *Id.* The ALJ concluded Plaintiff's impairments – singly or in combination, did not meet or medically equal the severity of a listed impairment. (Tr. 18). Thereafter, she found Plaintiff retained the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: She requires a cane for ambulation, and the ability to stand and stretch for two to three minutes once every 45 minutes. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She can never climb ladders, ropes, or scaffolds, or operate foot controls. She is limited to simple tasks that are not fast paced meaning the pace of productivity is not dictated by an external source over which she has no control. She can have occasional interaction with coworkers, supervisors, and the public. Finally, the work routine should be repetitive from day to day with few and expected changes.

(Tr. 20). Based on this RFC, the ALJ found Plaintiff was unable to perform any past relevant work, but given her age, education, and experience, there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform. (Tr. 26-27). Therefore, she concluded Plaintiff was not disabled. (Tr. 28).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises two objections to the ALJ's decision. First, she argues the ALJ erred at Step Five because the ALJ's RFC included a limitation identified by the VE as work-preclusive. Second, she contends the ALJ erred at Step Three by failing to properly consider whether Plaintiff's impairments met or equaled Listing 1.02A. The undersigned addresses Plaintiff's contentions in reverse order.

Step Three

During Step Three in the ALJ's evaluation process, the applicant may show that her impairment meets or equals a listed impairment, in which case, she will be considered disabled

without regard to age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d); *see Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments defines impairments that the agency considers "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a); *see Sullivan v. Zebley*, 493 U.S. 521, 531–32 (1990). A claimant's impairment must meet every element of a listing before the Commissioner will conclude that she is disabled at Step Three. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all elements are satisfied. *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984).

At Step Three the ALJ must "actually evaluate the evidence, compare it to [the applicable] Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). As the Sixth Circuit has explained, however, *Reynolds* does not require remand unless the claimant can "point to specific evidence that demonstrates [s]he reasonably could meet or equal every requirement of the [L]isting" and "[a]bsent such evidence, the ALJ does not commit reversible error by failing to evaluate a [L]isting at Step Three." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (distinguishing *Reynolds*; internal citations omitted); *see also*, *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (remand not required where claimant "has not shown that his impairments met or medically equaled in severity any listed impairment"; distinguishing *Reynolds*). Thus, in instances where the ALJ does not evaluate a listing, the court must "determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432. Plaintiff "must point to specific evidence that demonstrates [s]he reasonably could meet or equal every

requirement of the listing." *Id.* at 432.; *see also Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than . . . a mere toehold in the record on an essential element of the listing.").

At Step Three, the ALJ explained, in relevant part:

> While the claimant's impairments are severe, the record does not specifically establish that the claimant has an impairment that medically meets or equals the severity requirements of any listed impairment. The undersigned has examined and considered all listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with specific attention to Listings 1.02 (major dysfunction of a joint), 1.03 (Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 1.04 (disorders of the spine), [and] 1.06 (Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones)[.]

(Tr. 18).

Plaintiff asserts she has pointed to sufficient evidence to raise a reasonable probability that she satisfied Listing 1.02A, and thus the ALJ's failure to discuss it in detail is reversible error. *See* Doc. 11, at 10-14, Doc. 15, at 4-5. Thus, the undersigned turns to whether Plaintiff has pointed to record evidence raising a substantial question as to her ability to meet the Listing at issue.

The Listing at issue in Plaintiff's argument, Listing 1.02A, provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.02A. The definition referenced therein provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-

14

held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at Listing 1.00B2b. Taken together, to satisfy listing 1.02A, Plaintiff must show four things: 1) gross anatomical deformity; 2) chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion; 3) imaging of joint space narrowing, bony destruction or ankylosis; 4) involvement of one major weight-bearing joint resulting in an inability to ambulate effectively. *See id.* at Listing 1.02A.

The Commissioner responds that Plaintiff "fails to present specific medical findings to satisfy each element under Listing 1.02": and "[i]nstead skips to the second part of Listing 1.02, which requires . . . an inability to ambulate effectively." (Doc. 14, at 8). The undersigned finds the Commissioner's argument misrepresents Plaintiff's brief. Plaintiff quotes the relevant listing language, and then her analysis essentially sequentially tracks the requirements of the Listing. *See* Doc. 11, at 11-12.

First, Plaintiff points to evidence that might satisfy the "gross anatomical deformity" requirement of Listing 1.02. As described above, Plaintiff was in a motor vehicle accident resulting in injuries to both ankles. Her post-operative diagnosis was left trimalleolar ankle fracture, near amputation right ankle, and right distal radius fracture. (Tr. 532). Dr. Bowersock noted diagnoses

of, *inter alia*, displaced angulated fracture of the right radial styloid, nondisplaced fracture of the right ulnar styloid, right comminuted distal shaft fibula fracture, right distal tibia fracture, and left tibia fracture. (Tr. 585). In February 2016 (approximately a year after the accident), Dr. Neuschwanger noted x-rays showed osteoarthritis in the left ankle joint, and that "the right ankle joint is nearly completely obliterated". (Tr. 1392). He diagnosed post-traumatic osteoarthritis of both ankles. *Id.* There was also evidence in the record that Plaintiff's right ankle fracture did not heal, and nonunion was noted. *See* Tr. 1172 ("not completely healed yet at this time"), Tr. 1285 ("There is nonhealing of the fracture."), Tr. 1295 ("She has a gross nonunion."), Tr. 1385 ("difficult to say whether or not things are completely healed"), Tr. 1508-09 ("cystic changes to the fibula and the distal tibia malleolus"; "possible nonunion"), Tr. 1515 ("nonunion of oblique fracture of the base of the medial malleolus"), 1519 (noting right ankle lacks solid union). She ultimately underwent additional surgeries on both ankles. *See* Tr. 1295 (August 2015 - hardware removal deep right ankle, open treatment lateral malleolar ankle nonunion), Tr. 1411 (May 2016 - left ankle bone marrow aspirate graft tibial crest left leg, left ankle arthroscopy with extensive debridement and excision osteochondral lesion talar dome left ankle with osteochondral graft), Tr. 1519 (Dr. Ward's medical statement noting June 2017 surgery on right ankle, July 2017 surgery on left ankle).

Second, Plaintiff points to evidence of joint pain and stiffness with some limitation of range of motion, as required by Listing 1.02A. *See* Tr. 1126 (complaint of pain and stiffness; "a little bit stiff with flexion and extension" on the right); Tr. 1172 (complaint of sharp pain in both ankles); Tr. 1391-92 (complaint of bilateral ankle pain, limited painful crepitation range of motion in right ankle joint, and pain in left ankle joint on examination); Tr. 1394 (limited painful crepitation range of motion in right ankle joint); Tr. 1398 (swelling and pain in left ankle); Tr. 1437 (findings of

16

limited range of motion and strength in both ankles); Tr. 1505-06 (report of ankle pain, and findings of bilateral ankle swelling and painful range of motion); *see also* Tr. 1207, 1210, 1214 (reports of chronic ankle pain to primary care physician). There is certainly also evidence to the contrary. *See* Tr. 1387 (slight tenderness, but "good" range of motion); Tr. 1385 (no pain complaints, and full range of motion in the right ankle); Tr. 1392 (normal range of motion in the left ankle); Tr. 1394 (normal range of motion in the left ankle); Tr. 1398 (no limitation of range of motion in left ankle); Tr. 1499 (no ankle pain). However, the undersigned finds Plaintiff has set forth enough evidence to raise a "substantial question" as to whether she met this requirement of Listing 1.02A.

Third, Plaintiff has presented imaging evidence that raises a substantial question about whether Listing 1.02A is met. *See* Tr. 1392 (Dr. Neuschwanger's February 2016 note that x-rays revealed "the right ankle joint is nearly completely obliterated"); Tr. 1508 (Dr. Ward's note that x-rays showed "severe ankle impingement", "severe degenerative joint disease to bilateral ankles", "subchondral and tibial bone cysts"); Tr. 1515 (right ankle CT scan showing nonunion of an oblique fracture of the base of the medial malleolus).

Fourth and finally (and contrary to the Commissioner's argument), the undersigned also finds the record raises a "substantial question" about Plaintiff's ability to ambulate. Plaintiff was non-weightbearing for several months after her February 2015 accident. *See* Tr. 578-79, 1131, 1126. In June, August, and October 2015, she was noted to use a walker. (Tr. 1158, 1165, 1172). In November, she was instructed to "start to weight bear as tolerated". (Tr. 1387). At a December 2015 emergency room visit, Plaintiff was discharged with crutches and a walking boot. (Tr. 1283). In January 2016, she was "weight bearing as tolerated". (Tr. 1385). In February 2016, one year after the accident, Plaintiff was "able to bear weight with the exception of pain coming from the

lower back and radiating into the legs" and was not using an assistive device. (Tr. 1383). A few days later, Plaintiff saw Dr. Neuschwanger reporting of chronic bilateral ankle pain. (Tr. 1391). In March, Plaintiff was "ambulating full weightbearing" (Tr. 1393), but in April reported continued pain (Tr. 1397). Plaintiff ultimately underwent an additional ankle surgery in May 2016 (Tr. 1411-13), leading to using a "fracture walker" during the healing process, *see* Tr. 1499 ("ambulating fracture walker partial weightbearing"). In March 2017, Dr. Ward recommended a left ankle brace. (Tr. 1509). In July 2017, she was in a walking boot after surgeries in June and July 2017. *See* Tr. 1519. Additionally, Plaintiff testified she could not walk more than 75 feet (Tr. 50), that she had used some form of assistive device since the accident (Tr. 51), and that she could not climb stairs without the use of a handrail and her crutch (Tr. 56, 61). Finally, Dr. Ward opined that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, could not walk enough to shop or bank, or climb a few steps at a reasonable pace with the use of a single handrail. (Tr. 1520).[3] The undersigned finds that this evidence, taken as a whole, satisfies Plaintiff's burden to raise a "substantial question" about whether she can ambulate effectively. This is so despite the Commissioner's argument that Plaintiff has not demonstrated any inability to ambulate effectively lasted for at least twelve months as required by the Listing. (Doc. 14, at 10). Accepting this argument would require the undersigned to make a factual determination based on the record as whole. But that is a job for the ALJ, not this Court. Although the Commissioner is certainly correct that there is evidence in the record to the contrary, it is the ALJ's duty to evaluate this evidence in the first instance, not this Court's.

---

3. The Commissioner correctly notes (Doc.14, at 8-9) that the ALJ, at Step Four, gave Dr. Ward's opinion "little weight" because it was "conclusory, does not contain a function-by-function analysis, and is for a limited, unknown period of time." (Tr. 25). However, this is not the only evidence in the record regarding Plaintiff's ambulation abilities.

Finally, the Commissioner argues that "[w]hile the ALJ's consideration of Listing 1.02 was cursory, she made sufficient factual findings elsewhere in her decision to support her conclusion at step three." *Id.* But the Sixth Circuit has explicitly rejected adopting such a contention as improper *post hoc* reasoning. *See Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585, at *6 ("But the district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02.").[4]

The ALJ may ultimately determine Plaintiff does not meet Listing 1.02A. But, as *Reynolds* counsels, the Court must remand here, "even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different." 424 F. App'x at 414 (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011)). It is the ALJ's "responsibility to at least address this question . . . [because] [w]ithout this analysis, it is 'impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.'", *Harvey*, 2017 WL 4216585, at *6 (quoting *Reynolds*, 424 F. App'x at 416). Thus, because Plaintiff has pointed to evidence to raise a "substantial question" as to whether she meets or equals Listing 1.02A, *Smith-Johnson*, 579 F. App'x at 432, the ALJ was required to "actually evaluate the

---

4. By comparison, in *Harvey*, the Sixth Circuit found an ALJ erred in not expressly evaluating Listing 1.02A when the evidence presented was as follows:

> Harvey suffered from knee pain from at least 2010, had visited the emergency room on several occasions due to pain, swelling, and instability, was diagnosed with DJD, and had several surgeries, including four knee surgeries, to correct her problems. This evidence could support the criteria under Listing 1.02A.

> Moreover, Harvey's testimony and some medical reports indicate that Harvey could not "effectively ambulate" as required under § 1.00B2b (cross-referenced in Listing 1.02[A]).

2017 WL 4216585, at *6.

evidence, compare it to Section [1.02A] of the Listing, and give an explained conclusion, in order to facilitate meaningful review", *Reynolds*, 424 F. App'x at 416. As such, the undersigned recommends remand.

Step Five

Second, Plaintiff contends the ALJ erred because the VE's testimony contradicts the ALJ's RFC determination, and thus the Step Five decision is not supported by substantial evidence. The Commissioner contends there is no such contradiction.

The burden shifts to the Commissioner at Step Five of the sequential analysis to establish whether Plaintiff has the residual functional capacity to perform available work in the national economy. *Walters*, 127 F.3d at 529. To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17.

In this case, the hypothetical question on which the ALJ ultimately relied included a limitation to "only occasional interaction with coworkers, supervisors, and the public". (Tr. 68). The VE responded that such an individual could perform jobs such as final assembler, addresser, and sorter. (Tr. 69-70). Plaintiff's counsel then asked additional questions:

> Q:     If the - - an individual - - the hypothetical you were posed indicated that an individual could interact with supervisors, coworkers, and the public only on an occasional basis, correct, for the judge's hypothetical?

A:     Yes.

\* \* \*

Q:     And I assume that you considered, for that purposes, the DOT definition, which means up to a third of the day?

A:     Yes.

Q:     Okay. During that third of the day, does the worker decide when they will accept criticism or when they will accept instruction, or does the supervisor decide that sort of thing?

A:     That is dictated by an external source, either the supervisor or the work, itself, or . . . the production schedule.

Q:     Okay. It's not - - the case isn't that the worker says, hey, boss, can you come back and criticize me later and not right now.

A:     No, no. No, you have to be able to accept criticism whenever it's coming at you.

Q:     Okay. So if, at that particular moment, that happens to be part of the two-thirds of the day that the claimant's unable to do that work or the claimant is unable to interact, or whatever reason, the supervisor, his priorities take precedence over the worker.

A:     Correct.

Q:     And if that happens to be the wrong minute, it really doesn't matter whether that's - - whether the other two-thirds of the day she can accept it. If he comes to her at that time, such a person, and that's a problem, then she's either going to get reprimanded or eventually terminated, depending on the job description.

A:     Yes.

Q:     So it - - really, they have to be able to respond appropriately to supervisors, whenever the supervisor comes to [them]?

A:     Yes, at all times, Yeah.

(Tr. 72-74).

Plaintiff interprets the VE's testimony as meaning "that an ability to interact with supervisors only up to one-third of the day was essentially work preclusive". (Doc. 11, at 8). The

21

Commissioner responds that there was no conflict between the VE's testimony and the RFC finding because "Plaintiff's counsel did not elicit testimony that was specific to the positions identified by the VE"; that is "Plaintiff's counsel never asked the VE whether an employee who could not engage in greater than occasional interactions with supervisors would be able to perform the jobs of final assembler, addresser, and sorter, as identified by the VE at the hearing". (Doc. 14, at 13). Additionally, the Commissioner contends this argument is waived and fails because it is speculative. *Id.* at 13-14.

The undersigned finds no Step Five error. The ALJ asked the VE a question containing each restriction contained in the RFC, including a limitation to "only occasional interaction with . . . supervisors". (Tr. 68). The VE identified three potential jobs for such an individual. *See* Tr. 69-70. Plaintiff's argument, in essence, assumes a further limitation in the RFC that the ALJ did not include. Specifically, counsel's questions to the VE assume a limitation that the individual would only occasionally be able to interact with supervisors *and* that the timing for such interactions is fixed – there is a fixed one-third of the day wherein she can interact with supervisors, and a fixed two-thirds of the day when she cannot. But neither the RFC, nor the ALJ's question to the VE, included such a limitation. The limitation to "occasional interaction with . . . supervisors" is a durational limitation. That is, it means the individual cannot interact with supervisors, for more than one-third of a total workday. It does not include that the individual be able to dictate during what portion of the workday that interaction occurs. Nor was the ALJ required to include such a limitation. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals[.]"). The VE testified that one who can interact with supervisors occasionally could perform the jobs

identified. *See* Tr. 69-70. Therefore, there is no conflict between the RFC and the VE's responses. Thus, the undersigned recommends the Court find no error in the ALJ's Step Five determination.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be reversed and remanded for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


      s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).